EDWARD A. NEUMAN DE VEGVAR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 58742. Filed August 27, 1957.

*Milton Ross, Esq.*, for the petitioner.
*Rutheled B. Wolter, Esq.*, for the respondent.

#### OPINION.

RAUM, *Judge:* Respondent determined a deficiency in petitioner's income tax for the year 1948 in the amount of $8,744.84. At issue in this proceeding is whether respondent was correct in concluding that petitioner's capital gains were taxable because he was a nonresident alien "engaged in trade or business in the United States" within the meaning of section 211 (b) of the Internal Revenue Code of 1939 [1] during the period January 1 through June 21, 1948.

---

[1] SEC. 211. TAX ON NONRESIDENT ALIEN INDIVIDUALS.

(b) UNITED STATES BUSINESS OR OFFICE.—A nonresident alien individual engaged in trade or business in the United States shall be taxable without regard to the provisions

The parties have filed two stipulations of facts. One, titled "Stipulation of Facts," contains evidence dealing primarily with transactions in securities and commodities entered into on petitioner's behalf. The facts of that stipulation are so found by this Court.

The second stipulation, titled "Supplemental Stipulation of Facts," was submitted subject to our ruling on petitioner's objection to its introduction. He objected "to the introduction of such evidence upon the grounds that it is irrelevant and immaterial to any of the issues in this case." The paragraphs numbered (1) through (5) of the supplemental stipulation contain evidence concerning petitioner's connection with two Florida corporations. This evidence is relevant and material to the issues in this case and the facts in those paragraphs are so found. The last paragraph, numbered (6) contains evidence which is irrelevant and immaterial, and accordingly is not incorporated in our findings.

In determining whether petitioner was engaged in trade or business during the period at issue it is important to view the period against a background of related activity going back to 1942. Cf. *Chang Hsiao Liang*, 23 T. C. 1040.

At the beginning of 1942 petitioner, who did not enter this country until June 22, 1948, had assets in the United States worth $2,300,000. These assets consisted of $1,000,000 in currency, and $1,300,000 face amount ¾ per cent United States Treasury Notes Series A. The assets were held in New York City by petitioner's attorneys, Morris H. Frank and the late Edward L. Steckler, as custodians for petitioner.

On or about September 14, 1942, petitioner entered into a custody agreement with the Chase National Bank in the City of New York on the usual printed form of custody agreement prepared and used by the bank. On or about September 23, 1942, petitioner executed and delivered a power of attorney on the usual printed form of power of attorney prepared and used by the bank wherein he named Frank and Steckler, and each of them, as his attorneys in fact. The power of attorney remained in effect until after June 22, 1948, but was not thereafter exercised.

---

of subsection (a). As used in this section, section 119, section 143, section 144, and section 231, the phrase "engaged in trade or business within the United States" includes the performance of personal services within the United States at any time within the taxable year, but does not include the performance of personal services for a nonresident alien individual, foreign partnership, or foreign corporation, not engaged in trade or business within the United States, by a nonresident alien individual temporarily present in the United States for a period or periods not exceeding a total of ninety days during the taxable year and whose compensation for such services does not exceed in the aggregate $3.000. Such phrase does not include the effecting, through a resident broker, commission agent, or custodian, of transactions in the United States in commodities (if of a kind customarily dealt in on an organized commodity exchange, if the transaction is of the kind customarily consummated at such place, and if the alien, partnership, or corporation has no office or place of business in the United States at any time during the taxable year, through which or by the direction of which such transactions in commodities are effected), or in stocks or securities.

Petitioner transferred his United States assets from the custody of Frank and Steckler into his account with the bank as follows:

| | | | | |
|---|---|---|---|---|
| Aug. 13, 1942 | $3,000 cash | Feb. 17, 1943 | $100,000 notes |
| Sept. 14, 1942 | 100,000 notes | Feb. 23, 1943 | 100,000 notes |
| Oct. 19, 1942 | 100,000 notes | Mar. 3, 1943 | 100,000 cash |
| Oct. 26, 1942 | 100,000 notes | Mar. 14, 1944 | 100,000 cash |
| Nov. 19, 1942 | 200,000 notes | Mar. 17, 1944 | 200,000 cash |
| Jan. 6, 1943 | 100,000 notes | Jan. 12, 1945 | 100,000 notes |
| Jan. 15, 1943 | 100,000 cash | Feb. 20, 1945 | 400,000 notes |
| Jan. 16, 1943 | 100,000 cash | June 26, 1945 | 97,000 cash |
| Jan. 29, 1943 | 100,000 cash | | |
| Feb. 4, 1943 | 100,000 cash | Total | 2,300,000 |
| Feb. 10, 1943 | 100,000 cash | | |

The procedure for making all transactions in the period from the opening of the custody account to June 22, 1948, was as follows: One of petitioner's attorneys would give instructions by telephone to an official at the Chase National Bank to buy or sell (or both) specified securities. All decisions with respect to such transactions were made by the attorneys. The instructions would specify the names and quantities of shares or bonds, whether to buy or sell, and the broker (who was always a resident broker) to handle the transaction. The price was usually left to the broker's discretion. The instructions would be confirmed by letter from the attorney. The bank would transmit the order to the designated broker, who would execute the order on the stock exchange in the usual manner. Since stock is customarily traded in units of 100 shares, orders involving more than 100 shares of stock would often result in more than one trade on the floor of the stock exchange.

From time to time from the opening of the custody account until June 22, 1948, changes were made in petitioner's holdings pursuant to instructions given by petitioner's attorneys on the number of days in each year as follows:

| Year | Total days in which instructions were given | No. of days in which petitioner's attorneys gave instructions for— | |
|---|---|---|---|
| | | Purchases | Sales |
| 1942 | 5 | 4 | (1) |
| 1943 | 16 | 13 | [2] 7 |
| 1944 | 22 | 19 | 8 |
| 1945 | 12 | 8 | [3] 9 |
| 1946 | 28 | 17 | 16 |
| 1947 | 20 | 12 | 10 |
| Jan. 1–June 22, 1948 | 13 | 13 | 4 |

[1] Treasury notes liquidated.
[2] Includes 3 sales of Treasury notes.
[3] Includes 1 sale of Treasury notes.

The instructions which were given on the days specified in the above paragraph resulted in approximately the following numbers and amounts of trades on the floor of the stock exchange:

| Year | Purchases | | Sales | |
|---|---|---|---|---|
| | Number | Amount | Number | Amount |
| 1942 | 79 | $306,000 | 4 | $500,000 |
| 1943 | 109 | 954,000 | 23 | 260,000 |
| 1944 | 142 | 786,000 | 69 | 405,000 |
| 1945 | 57 | 402,000 | 44 | 438,000 |
| 1946 | 86 | 667,000 | 257 | 1,726,000 |
| 1947 | 35 | 183,000 | 42 | 403,000 |
| Jan. 1–June 22, 1948 | 60 | 384,000 | 31 | 305,000 |

During the period from the opening of the custody account through December 31, 1948, petitioner made two investments in commodities.

In September 1947 he, through his agents, purchased 20 wool tops futures contracts on the commodity exchange through Goodbody & Co., a recognized resident independent stock and commodity broker, at an investment of $15,000. He sold the futures on February 11, 1948, at a gain of $10,000, receiving net proceeds of $25,000. This transaction involved wool tops having a sales value of $170,000.

On October 31, 1946, he, through his agents, purchased 10 May and 10 July cotton futures contracts on the commodity exchange through Goodbody & Co. at an investment of $40,000 paid on November 1, 1946, and $15,000 paid on November 8, 1946. He sold the futures on November 13, 1946, at a net gain of $1,195, receiving net proceeds of $56,195 on November 21, 1946. This transaction involved cotton having a sales value of $282,570.

Petitioner never took actual delivery of and never owned any commodity.

Wool tops and cotton futures are customarily dealt in on an organized commodity exchange, and the foregoing transactions are of the kind customarily consummated at such place.

During this period petitioner and his agents did not purchase stocks or bonds on margin, did not borrow money to finance transactions in stocks or bonds, did not acquire hedges, did not make any short sales, and did not purchase puts and calls.

During the period from January 1, 1943, to June 22, 1948, petitioner held cash, United States Treasury notes, and other securities, realized gains from sales of securities (in addition to the commodity gains mentioned above), and received dividends and interest in the following amounts:

| Year | Cash, Treasury notes and other securities held on January 1 | | Realizable net gains at January 1 | Net gains realized during year | Dividends and interest received |
|---|---|---|---|---|---|
| | At cost | At market value | | | |
| 1943 | $2,204,411.44 | (¹) | (¹) | $55,303.68 | $56,686.30 |
| 1944 | 2,332,423.74 | ² $2,618,062.25 | ² $285,638.51 | 44,015.95 | 76,605.57 |
| 1945 | 2,447,648.95 | ² 2,974,507.54 | ² 526,858.59 | 101,915.83 | 99,512.41 |
| 1946 | 2,613,002.29 | 3,765,300.40 | 1,155,298.11 | 534,863.58 | 96,279.34 |
| 1947 | 3,208,056.33 | 3,632,516.31 | 424,459.98 | 11,452.00 | 73,074.42 |
| 1948 | 3,225,294.21 | 3,611,008.16 | 385,713.95 | ³ 7,840.83 | ³ 38,665.17 |

¹ Unavailable.
² January 31.
³ January 1-June 22.

The securities sold by petitioner during the period January 1 to June 21, 1948 (no sales were made on June 22, 1948), had been held by him for the following lengths of time according to the books of account:

| Period held | Sales | | Net gains (or loss) |
|---|---|---|---|
| | Amount | Percentage | |
| 5 years or longer | $25,815.81 | 8.4 | $13,786.03 |
| 4½ years or longer | 20,196.88 | 6.6 | 196.88 |
| 4 years or longer | 20,196.88 | 6.6 | 196.88 |
| 3½ years or longer | 20,196.88 | 6.6 | 196.88 |
| 3 years or longer | 122,234.07 | 40.1 | 6,577.72 |
| 2½ years or longer | 36,217.70 | 11.8 | (4,622.17) |
| 2 years or longer | 60,076.16 | 19.8 | (8,506.55) |
| 1½ years or longer (Rights) | 72.93 | 0.1 | 15.16 |
| Less than 1½ years | 0 | 0 | 0 |

Petitioner maintained books of account in which separate accounts were kept for income from dividends and interest and for gains from sales. All gains from sales derived during the entire period from the opening of the custody account to June 22, 1948, were kept in the custody account and invested and reinvested and no amount thereof was withdrawn or used by petitioner for living expenses.

In November 1942, petitioner through his attorneys, Frank and Steckler, purchased two citrus groves and paid $82,753.64 for them out of the assets held in his custody account in the Chase National Bank. The groves were not owned by petitioner individually at any time during the period January 1 to June 22, 1948.

One of the citrus groves, consisting of 222½ acres of which 193 acres were cultivated, was located at Avon Park, Florida. It was operated by George Riddle pursuant to an agreement dated October 12, 1942. George Riddle was independently engaged in operating citrus groves for absentee owner-investors. He operated approximately 3,500 acres of citrus groves, including the Avon Park property owned by petitioner. He had complete charge of all phases of cultivation and marketing of fruits, and supplied all necessary supervision, labor, and materials. He charged his customers, including

petitioner, the actual direct costs applicable to the customer's grove and a pro rata share of indirect costs, plus a management fee.

The other citrus grove, consisting of 40 acres, was located at Vero Beach, Florida. It was operated until February 28, 1945, by Forrest C. Graves pursuant to an agreement dated December 4, 1942, and thereafter by the firm of Knight & Strickland pursuant to an agreement dated March 1, 1945, and thereafter by George Riddle pursuant to an agreement dated July 1, 1946. Forrest C. Graves and Knight & Strickland were independently engaged in operating citrus groves for absentee owner-investors. The method of operation of each of these firms was similar to that of George Riddle.

In March 1947, petitioner's attorneys organized two Florida corporations and thereafter during 1947 transferred one of the groves to each of the corporations. After incorporation and throughout the year 1948 the groves were operated by the corporations. Petitioner had no interest in the groves after incorporation except as sole stockholder and bondholder. Petitioner did not participate directly or indirectly in the management or operation of the groves after incorporation.

Frank, Steckler, and another attorney associated with their firm were the officers and directors of both corporations. The attorneys did not participate in the management of the groves. The operation of the groves was conducted for the corporations by the manager, George Riddle.

At all times mentioned herein petitioner maintained his personal books of account and reported his income on a cash and calendar year basis.

Frank and Steckler were attorneys engaged in the practice of law as partners. The petitioner was one of many of their clients. In the attorneys' law office, at 60 East 42d Street, New York, New York, there was no room, desk, or space allocated to petitioner. Petitioner's name was not listed on their door or building directory or in any telephone directory. Petitioner paid no rent to the attorneys. There was no secretarial employee of petitioner in the law office or elsewhere in the United States. Dividends and interest were received by the bank custodian; the attorneys received statements thereof from the bank. Mail addressed to petitioner alone would not be delivered to petitioner at the attorneys' law office, but would have to be addressed in care of the attorneys. Petitioner's records and books of account were not kept at the attorneys' law office, but were kept by an independent accounting firm engaged by the attorneys. Plainly, petitioner had no office in the United States.

If petitioner himself had given the buy and sell orders to the brokers, his transactions in securities and commodities would not have been sufficient to characterize him as being "engaged in trade or busi-

ness in the United States" because the last sentence of section 211 (b) explicitly excludes such transactions. Moreover, his trading was not sufficiently extensive over the period in question to qualify as a "trade or business." In this respect, we think that the facts herein are not significantly different from those in *Chang Hsiao Liang*, 23 T. C. 1040, and that here too the transactions were related to the maintenance of a personal investment account rather than carrying on a trade or business. *Fernand C. A. Adda*, 10 T. C. 273, affirmed 171 F. 2d 457 (C. A. 4), certiorari denied 336 U. S. 952, relied upon by the Government, is distinguishable for reasons set forth in the *Liang* case, 23 T. C. at 1045. And in *Van Der Elst* v. *Commissioner*, 223 F. 2d 771 (C. A. 2), also relied upon by the Commissioner, the court held that a taxpayer who was receiving a salary as an officer of a New York corporation was engaged in trade or business in the United States—a situation quite different from the one before us.

We cannot agree with the Government's argument, seriously pressed upon us, that the activities in connection with the citrus groves furnish the basis for liability here. During the year in controversy the groves were owned by two corporations, and the Government makes no contention that their existence should be disregarded. Rather, it urges that petitioner's attorneys were officers or directors of the corporations and that therefore he was engaged in business through them. Petitioner, on the other hand, contends that the attorneys while acting as corporate officers or directors were not his agents but were the agents of the corporations. However, we need not discuss these highly theoretical contentions because the parties have stipulated that "petitioner did not participate directly or indirectly in the management or operation of the groves after * * * incorporation." We think that this stipulation completely eliminates the citrus groves as a basis for attributing a trade or business to petitioner.

*Decision will be entered under Rule 50.*